**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
KADEN BYRON (SBN 333158)
*kbyron@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
DANIEL E. SACHS (SBN 361027)
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| NELI MEDVEDEVU, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>THE TRADE DESK, INC. and REGIONAL WOMEN'S HEALTH GROUP, LLC,<br><br>Defendants. | Case No: 2:26-cv-2537<br><br><u>CLASS ACTION - SEEKING STATEWIDE OR NATIONWIDE RELIEF</u><br><br>**COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff NELI MEDVEDEVU, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, brings this action against Defendants THE TRADE DESK, INC. ("Trade Desk") and REGIONAL WOMEN'S HEALTH GROUP, LLC, d/b/a Axia Women's Health Management and/or Axia Women's Health ("Axia"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1. Defendant Axia is a private healthcare system that provides a wide spectrum of in-person and online care focused on women's health. Axia owns and operates the website located at https://www.axiawh.com ("axiawh.com," or the "Website"), which provides a portal to access Axia-provided health services for women.

2. People visiting axiawh.com regularly search for women's health centers, submit detailed information forms, access medical resources, message care centers, schedule appointments, and pay medical bills.

3. Unbeknownst to Plaintiff—and in a significant violation of her privacy—Axia allowed Defendant Trade Desk, without consent or notice, to intercept, read, and use for commercial gain her personally identifying information ("PII") and protected health information ("PHI") collected while she browsed and used axiawh.com.

4. Plaintiff, on behalf of herself and others similarly situated, brings this action to enjoin Axia from disclosing patients' PII and PHI to third parties without consent; to enjoin Axia from embedding third-party tracking technology on axiawh.com that intercepts and transmits such information without patients' knowledge; to enjoin Trade Desk from intercepting and exploiting patients' private health communications for commercial gain; and to recover compensatory damages for herself and other aggrieved Class Members.

## JURISDICTION & VENUE

5. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the Class of

1

plaintiffs is a citizen of a State different from Defendants. In addition, more than two-thirds of the members of the Class reside in a state other than the state in which Defendants are citizens, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

6. The Court also has original jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States (the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*).

7. The Court has personal jurisdiction over Trade Desk because its principal place of business is in Ventura, California. The Court also has personal jurisdiction over Trade Desk because it has purposely availed itself of the benefits and privileges of conducting business activities within California by making axiawh.com, embedded with Trade Desk's trackers, cookies, and pixels, available to California consumers.

8. The Court has personal jurisdiction over Axia because Axia purposefully availed itself of the privileges of conducting business in California. Axia deliberately embedded tracking technology developed and operated by Trade Desk, a corporation headquartered in Ventura, California, on its patient-facing website axiawh.com. By embedding that technology, Axia knowingly and intentionally caused its patients' PII and PHI to be transmitted to Trade Desk's California-based servers and platform. Axia's conduct was not passive or incidental. Deploying Trade Desk's pixel required Axia to affirmatively obtain and implement proprietary tracking code tied to a Trade Desk account, establishing a continuing commercial relationship directed at California. California was therefore a foreseeable and intended forum for disputes arising from Axia's deliberate use of Trade Desk's California-based infrastructure to collect and monetize its patients' data.

9. Venue is proper in this Central District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants reside in (*i.e.*, are subject to personal jurisdiction in) this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

10. Plaintiff Neli Medvedevu is over 18 and resides in Montgomery County, Pennsylvania.

11. Defendant Trade Desk is a Delaware corporation with its principal place of business in Ventura, California.

12. Defendant Axia is a New Jersey corporation with its principal place of business in Oaks, Pennsylvania.

## FACTS

**I.   PATIENTS USING AXIAWH.COM COMMUNICATE PII AND PHI**

13. Axia, which reported about $750 million in annual revenue in 2025, owns and operates axiawh.com.

14. When patients browse the Website to search for medical care services, including when clicking on specific care providers and links or when manually typing search queries in the Website's built-in search function, they communicate private and extremely personal information to Axia. This includes, but is not limited to, medical conditions, care preferences, and appointment schedules, all of which constitute PHI.

15. The Website home page includes a prominent link along the top bar to "Find Care Near You." Alternatively, visitors may select a "Find Care" button on the home page. Either link brings them to the website's "Find Care" page (https://axiawh.com/location-provider-search/):

///

///

///

///

///

///

///

///

3

16.     When patients click the "Service" dropdown menu, they are presented with approximately 13 discrete medical specialty categories, such as fertility, weight loss, maternal fetal medicine (a branch of obstetrics focusing on high-risk pregnancies and care for mothers and babies facing complex health issues), and breast health. When a patient selects a category, the website captures data reflecting the specific type of medical care the patient is seeking. Thus, patients communicate information about their medical conditions—their PHI—to Axia.

17.     The Website also features a "Find Care Near You" page, which allows patients to browse or search for nearby medical facilities along with specific services. By using the Find Care Near You page, Website users communicate both PII and PHI to Axia.

18.     To use the Find Care Near You page, a user inputs their zip code then is given a selection of services available within a certain geographical range. The Website then generates a list of clinics, providers, and services coupled with an embedded Google Map

display. If these results are insufficient, the patient can click on "View All Locations" and the Website provides all locations that provide the service the patient is searching for. The Find Care Near You page is depicted below.



19. When the patient clicks on a particular provider profile, they are sometimes able to make an appointment directly through the Website with that provider. To do so, patients must enter their full name, date of birth, preferred location, patient status, email, phone number, and type of appointment, further revealing PII and PHI, as depicted below.

///

///

///

///

///

///

5



20.    Website users also have access to a "Patient Forms" page, where they can submit medical documentation and insurance information, in which case patients must also provide their full name, date of birth, state, and phone number, as depicted below. Users who fill out a "Patient Form" thus communicate their PII and PHI to Axia.

///
///
///
///
///
///
///
///
///
///

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT



21.    The Website also features a "Contact" page, where patients can input their first and last name, phone number, email address, and reason for the inquiry, thereby disclosing PII and PHI to Axia. This inquiry is available for existing and prospective patients, and even non-patients, as depicted below.

## II. AXIA MEMBERS HAVE A REASONABLE EXPECTATION OF PRIVACY IN THEIR PII AND PHI

22. When Website users communicate their PII and PHI to Axia, they reasonably believe Axia will maintain the confidentiality of that information, due to both the inherently sensitive and private nature of the information, and due to the long-standing and well-known legal protections afforded to such information.

23. "Since the creation of the Hippocratic Oath around 400 B.C., protecting the privacy of patients has been a key component of the physicians' code of conduct."[1] Today, people continue to believe their health data is protected through laws such as HIPAA.

24. Moreover, while all health data is inherently sensitive and private, the health data communicated to axiawh.com is particularly so. For example, users can search for "Fertility" services, a matter widely recognized as deeply personal, private and sensitive. Likewise, "Gynecology," "Genetics," "Midwifery," and "Obstetrics," all implicate

---

[1] https://epic.org/issues/data-protection/health-privacy.

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

reproductive care. According to the Electronic Privacy Information Center, "[h]ealth privacy and reproductive privacy implicate some of our most sensitive information that can reveal intimate characteristics about us."[2] "The right to make reproductive choices about one's own body—free from commercial or governmental interference—is inherent to one's dignity and autonomy."[3] Indeed, the expectation of privacy for reproductive health information is particularly high given recent efforts to criminalize certain reproductive health choices.

25.    Other services on the Website include "Rejuvenation" and "Menopause Solutions," for example, which reveal information considered to be particularly sensitive or stigmatized.

26.    Further, the Website provides no notice to users that their PII and PHI is being tracked, collected, or stored. Nor are Website users given any choice to opt in or out of the collection of their PII and PHI.

27.    At the bottom of the Website's homepage, where users can and do ignore it, there are inconspicuous, fine-print links to a "Privacy Policy," and "Notice of Privacy Practices." Yet even if one were to notice, click on, and read these documents, nowhere do they disclose that Axia is allowing undisclosed third parties to collect and use for financial gain website users' PII and PHI.

## III.    TRADE DESK COLLECTS AND PROFITS FROM PATIENTS' PHI AND PII WITHOUT THEIR CONSENT

28.    Because Plaintiff and other Class Members are unaware of Trade Desk's tracking on the Website they could not and did not consent to it.

29.    Notwithstanding website users' lack of consent to Trade Desk's tracking practices and the historically protected and inherently sensitive nature of the information at issue, Axia allows Trade Desk to intercept and use for commercial gain Website users' PII and PHI.

---

[2] *Id.*

[3] *Id.*

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

30.     Trade Desk, Inc. is a publicly traded advertising technology company and the largest independent demand-side platform in the world. Trade Desk's business model depends on harvesting data about individual users' online behavior, including their browsing activity and interactions with third-party websites, to build audience profiles used to deliver targeted advertisements. Trade Desk collects this data through tracking technologies, including pixels and cookies, deployed on third-party websites whose operators have entered into commercial agreements with Trade Desk, exchanging their users' data for access to Trade Desk's advertising platform.

31.     Trade Desk offers website owners like Axia a free tracking pixel,[4] called Trade Desk Pixel ("TDP"). Using TDP, Trade Desk monitors user activity, including what pages users view, what links and services they click on, what they search for, and what data they input into website systems. TDP thus allows Trade Desk to eavesdrop on, collect, and use for pecuniary gain the PII and PHI of Website visitors, including Plaintiff and other Class Members.

32.     When TDP is installed on a website, the pixel code connects the website to Trade Desk's platform. When a browser loads the site, the code instructs Trade Desk to deploy its tracking cookie, TDID, through Trade Desk's servers at adsrvr.org.[5]

33.     Trade Desk assigns a unique identifier to each user, which allows it to track activity across any websites that also embed TDP. In doing so, Trade Desk can, as it does

[4] A pixel is a small piece of code embedded on a website that helps track user behavior. Despite the name, it is not a visible pixel on the screen. Rather, it is a 1x1 transparent image, or small snippet of JavaScript that loads when someone visits a webpage or opens an email. For websites that use tracking pixels, marketers can see if a user completed a specific action, like clicking a link, typing in a search query, making a purchase, or filling out a form.

[5] Cookies, sometimes "HTTP cookies" or "internet cookies," are built specifically for web browsers (like Chrome, Edge, Safari, etc.) to track, personalize and save information about each user's session. A "session" is the word used to identify the user and to define the amount of time that user spends on a site. The web server—which stores the website's data—sends a short stream of identifying information to the user's web browser and identifying data is processed and read by "name-value" pairs. These pairs tell the cookies where to be sent and what data to recall.

10

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

with data intercepted from axiawh.com, build detailed profiles of users and generate and show them targeted ads as they browse the internet.

34.    Because Trade Desk functions primarily as an advertising tracker, it is not directly connected to personal user profiles. However, it consistently identifies the same user, and on the same device. Thus, when a user provides personally-identifying information, like their name, email address, home address, or credit card information, when creating an account or purchasing items, Trade Desk will track that person on any other website embedded with its tracking pixel and cookies.

35.    The below screenshot shows Trade Desk's identifiers through its adsrvr.org server, coupled with the user's search for "Behavioral Health" in axiawh.com's search bar:



36.    The data collected is also used by Trade Desk to create a mapping of devices that could be used by the same person or people within a household, resulting in increased effectiveness with targeted ad campaigns for advertisers.

37. Trade Desk uses this data to create personalized ad experiences, analyze ad performance to refine targeting strategies, and associate user activity across different websites.

38. Trade Desk also uses data intercepted using TDP to train and refine Koa, its artificial intelligence solution to programmatic advertising.

39. In fact, Trade Desk's entire business model is selling its advertising services to third parties, framed as enhancing online advertising strategies. By using cookies and tracking pixels, Trade Desk gathers this information, including the PII and PHI associated with unique individuals, for its own pecuniary gain.

40. Axia also benefits from the installation of TDP on the Website. By enabling TDP, Axia is able to track user interaction with axiawh.com and can improve and broaden its own marketing, including through targeted ads on other websites, and through direct emails.

## IV. TRADE DESK'S UNDISCLOSED EAVESDROPPING ON AXIA'S WEBSITE VIOLATES HIPAA AND INDUSTRY STANDARDS, AND USERS' PRIVACY RIGHTS

41. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.

42. Guidance from the United States Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.[6]

43. TDP tracks users, collects their data (including PHI), and transmits that information to Trade Desk in real time. Thus, Trade Desk is eavesdropping on Axia Website patient-visitors.

44. In Guidance regarding Methods for De-identification of PHI in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructs:

---

[6] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data . . . . If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.

45.     Axia allows undisclosed eavesdropping by Trade Desk, purposely sharing its patients' PII and PHI with Trade Desk in contravention of its promises to protect user privacy, and makes minimal effort to safeguard user privacy through de-identification methods, in contravention of the guidance principles promulgated by HHS.

46.     In its guidance for marketing, HHS also instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.

47.     Medical providers' duty of confidentiality is a core tenet of the physician-patient, and hospital-patient relationship. However, Axia did not disclose its tracking of patients' data for commercial gain, nor did it obtain users' consent before doing so. Thus, Axia's conduct was and is in violation of the HIPAA Privacy Rule.

48.     The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications online.

49.     The AMA has also promulgated a list of principles that provide the framework for protecting patient privacy online. Many policies pertain to individual rights of patient-users online, including the right to "know exactly what data of theirs an entity is accessing, using, disclosing, and processing—and for what purpose—at or before the point of collection." Given that Axia Website users are not informed of this, Axia is acting in violation of AMA ethical standards.

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

50. Trade Desk's interception of patients' PII and PHI without consent, which Axia procured, exemplifies the utmost invasion of privacy and would be highly offensive to any reasonable person. These invasions of privacy are particularly offensive given that Trade Desk intentionally intercepts users' PHI for financial gain through better targeting of advertisements, that Axia allows these invasions of privacy for its own financial gain, and that Axia provides no mechanism for Website users to opt out of tracking before it occurs.

## V.   PLAINTIFF'S USE OF AXIAWH.COM

51. Between approximately June 2025 and September 2025, Plaintiff used the Axia Website and Axia's Patient Portal, on both her phone and computer to search for care providers, to request and make medical appointments, and to pay her medical bills.

52. At various times, Plaintiff utilized the "Find Care Near You" page and entered her zip code into the search function.

53. Through TDP, Trade Desk monitored Plaintiff's use of the Website in real time. As a result, Plaintiff's messages, reports, and communications on the Website were instantly available to Trade Desk. Everything Plaintiff browsed or searched on the Website was, without notice or permission, tracked and intercepted by Trade Desk instantly and automatically in real-time as it occurred.

54. Shortly after using the Website, Plaintiff received targeted advertisements concerning women's health.

55. Each time Plaintiff used the Website, Axia allowed Trade Desk to intercept, learn the contents of, and use for commercial gain Plaintiff's messages, reports, and communications.

56. Because Plaintiff's messages, reports and communications were intercepted simultaneously as they were being communicated, Trade Desk's interceptions occurred while the messages, reports and communications were in transit.

57. Trade Desk was never a party to the messages, reports or communications between Plaintiff and Axia. Plaintiff did not know that her messages, reports, or communications on the Website would be intercepted by Trade Desk.

58. Plaintiff did not know her PHI combined with her individual identifiers would be intercepted, used, or sold by Trade Desk.

59. Plaintiff did not consent to her messages, reports, or communications on the Website being intercepted by Trade Desk.

60. When visiting the Website, Plaintiff was unaware she was being tracked. Plaintiff did not have the ability to opt out of having her personal information on the Website shared with Trade Desk for commercial gain.

61. Plaintiff reasonably believed her messages, reports, and communications with Axia on the Website, including the PHI contained therein, were private. Plaintiff was aware of Axia's duty of confidentiality and reasonably expected that the private information provided, including her PII and PHI, would remain private and would not be shared with third parties for commercial purposes unrelated to patient care.

62. Axia's procurement of unauthorized interceptions of Website user communications has caused actual harm to Plaintiff and Class Members.

63. Plaintiff's and other Class Members' private and personal data, including their protected health information, IP addresses, and digital identifiers, have a recognized monetary value in today's digital economy. For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest Internet companies earn hundreds of dollars per American user through the interception and use of personal data. A 2014 Federal Trade Commission report, for example, detailed the value of user data, particularly health information, finding that data brokers sell data in sensitive categories for a premium.[7] In 2022, the FTC brought a lawsuit against a data broker for selling location data regarding people who visit abortion clinics, valued at approximately $160 per person for a week's worth of data.[8] And in a recent trial brought by the New Mexico Attorney General, one industry expert testified that Meta Platforms, Inc. derives approximately $270

---

[7] "Data Brokers: A Call for Transparency and Accountability," Fed. Trade Comm'n (May 2014).

[8] *Fed. Trade Comm'n v. Kochava Inc.*, No 2:22-cv-377 (D. Idah, filed Aug. 29, 2022).

in annual advertising revenue per teenage user based on the monetization of that user's digital profile, behavioral data, and identifiers. In sum, individuals' online personas—including identifiers, browsing behavior, and health-related inferences—are monetizable assets in the modern digital advertising economy. Defendants thus misappropriated data that carries measurable economic value in established markets.

64.     The value of health data in particular is well-known and has been reported on extensively. A 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," for example, described the extensive market for health data, noting it was both lucrative and a significant risk to privacy.[9]

65.     Due to the difficulty in obtaining personal and sensitive health information, illegal markets also exist for it. NPR reported that health data can be "more expensive than stolen credit card numbers."[10]

66.     Trade Desk's interception of Plaintiff's and other Class Members' PII and PHI without consent, which Axia procured, has deprived them of the economic value of their personal property without proper consideration, and has resulted in each of the Defendants being unjustly enriched at the expense of Plaintiff and other Class Members.

67.     Moreover, medical and health-related information is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiff and other Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. These communications included searching for medical specialists, scheduling medical appointments, and paying medical bills. The interception of these communications violated Plaintiff's and other Class Members' reasonable expectation that their interactions with a healthcare provider would remain private.

---

[9] Adam Tanner, "Our Bodies, Our Data: How Companies Make Billions Selling Our Medical Records," *Time.com* (Jan. 9, 2017), *at* https://time.com/4588104/medical-data-industry.

[10] Aarti Shahani, "The Black Market For Stolen Health Care Data," *NPR.org* (Feb. 13, 2015), *at*         https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data.

68. Axia's conduct has also undermined patient trust generally and created a chilling effect on digital healthcare communications. Plaintiff and other Class Members can no longer confidently use Axia's Website to seek medical information, locate healthcare providers, research treatments, or manage their healthcare without fear that their activities are being intercepted by third parties. This chilling effect may lead to reluctance to seek needed healthcare information or services online, potentially even impacting health outcomes.

69. Once intercepted by Trade Desk, Plaintiff's and other Class Members' data is beyond their control and may be used in perpetuity for commercial gain. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

## CLASS ACTION ALLEGATIONS

70. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), interacted with axiawh.com while it was embedded with the Trade Desk Pixel tracker (the "Class").

71. The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class in a single action will provide substantial benefits to the parties and the Court.

72. Questions of law and fact common to Plaintiff and the Class include but are not limited to:

a. Whether axiawh.com, through embedded trackers and cookies, collected PII or PHI;

b. Whether Axia disclosed to any third parties, including Trade Desk, the PII or PHI of Class Members, or messages, reports, and communications between itself and Class Members;

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

c. Whether Axia procured Trade Desk to intercept Class Members' electronic communications on axiawh.com;

d. Whether Trade Desk intentionally intercepted Class Members' electronic communications as a result of Axia's procurement;

e. Whether the interception, disclosure, use, sharing, and sale of Class Members' sensitive personal data for targeted advertising is unconscionable to a reasonable person;

f. Whether Axia owed Plaintiffs and other Class Members a duty of care;

g. Whether Axia breached that duty of care;

h. Whether Defendants, or either of them, were unjustly enriched;

73. These common questions of law and fact predominate over questions that affect only individual members of the Class.

74. Plaintiff's claims are typical of the Class's claims because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same violations of privacy and other unlawful and unfair business practices as a result of using axiawh.com.

75. Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, who will vigorously prosecute this action and will otherwise protect and fairly and adequately represent Plaintiff and the Class.

76. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for each Class Member to redress the wrongs done to them.

77. Defendants have acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

78. As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*

### (Against Trade Desk)

79.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

80.    The Electronic Communications Privacy Act ("ECPA") provides a private right of action to "any person whose . . . electronic communications are intercepted, disclosed, or intentionally used in violation of" the Act. 18 U.S.C. § 2520(a).

81.    The Act prohibits "intentionally intercept[ing] . . . any wire, oral or electronic communication," *see id.* § 2511(1)(a), provided, however, that "[i]t shall not be unlawful . . . for a person . . . to intercept a wire, oral or electronic communication, where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such interception is for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State," *id.* § 2511(2)(d).

82.    Under the Act, "intercept" means the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device," 18 U.S.C. § 2510(4), where "contents" includes "any information concerning the substance, purport, or meaning of [a] communication." *Id.* § 2510(8).

83.    Under the Act, "electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce," with some exceptions not applicable here. *Id.* § 2510(12).

84.    Under the Act, conduct is intentional when it, or the results thereof, are the person's conscious objective. *In re HIPAA Subpoena*, 961 F.3d 59 (1st Cir. 2020).

85.    Under the Act, an "electronic, mechanical, or other device" is "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

86.    The following constitute "devices" within the meaning of § 2510(5):

a.    Plaintiff's and other Class Members' browsers;

b.    Plaintiff's and other Class Members' computing devices;

c.    Axia's web-servers;

d.    Axia's website, axiawh.com; and

e.    The tracking code designed by Trade Desk and deployed by Axia to effectuate the sending and acquisition of patient communications (*i.e.*, TDP).

87.    The transmissions by Plaintiff and other Class Members of their PII and PHI to axiawh.com were "electronic communication[s]" within the meaning of 18 U.S.C. § 2510(12). Trade Desk was never a party to any of the communications sent by Plaintiff and other Class Members to axiawh.com.

88.    Through the use of TDP installed on axiawh.com, Trade Desk intentionally intercepted the contents of Plaintiff's and other Class Members' electronic communications, in violation of 18 U.S.C. § 2511(1).

89.    Plaintiff and other Class Members did not consent to Trade Desk's interception of their private communications with axiawh.com, nor could they have consented because they were unaware of Trade Desk's interceptions, which occurred concurrently as they used axiawh.com.

90.    Trade Desk cannot rely on the one-party consent rule exception of § 2511(2)(d). HIPAA makes it a crime to, as relevant here, "knowingly and in violation of [the Administrative Simplification provisions of HIPAA] disclose[] individually identifiable health information," or "IIHI," to another person. 42 U.S.C. § 1320d-6(a)(3); *see also id.* § 1320d-6(b) (setting out penalties, including fines and imprisonment). IIHI is defined as:

any information, including demographic information collected from an individual, that (A) is created or received by a health care provider . . . and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies

20

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

*Id.* § 1320d(6).

91. Axia operates as a covered healthcare provider under HIPAA, and the information patients input on the "Find Care Near You" page—such as symptoms, conditions, provider preferences, and appointment scheduling information—is collected directly by Axia in the context of its members seeking care. The information relates to the provision of health care and the individual's health status. Finally, Trade Desk embeds a persistent, unique identifier in each visitor's browser, which is transmitted back to Trade Desk along with the user's IP address and page-level data. When these unique identifiers travel in the same payload as the symptoms, conditions, and specialty preferences a patient enters on the "Find Care Near You" page, the combined dataset becomes IIHI, and therefore PHI, because the identifiers can be used by Trade Desk to single out the individual whose health data is implicated.

92. Accordingly, Axia's transmission of that data to Trade Desk constitutes a "disclosure" of PHI under HIPAA. *See* 45 C.F.R. § 160.103, 164.502(a), 164.514(b)(2).

93. Additionally, Trade Desk intercepts users' PII and PHI for the purpose of invading their privacy by using the data to train AI models, build detailed user profiles, and send targeted advertising.

94. Plaintiff and other Class Members suffered harm as a result of Trade Desk's violations of the Act, and seek (a) preliminary, equitable, and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and the profits obtained by Trade Desk as a result of its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

## SECOND CAUSE OF ACTION

**Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*.**

**(Against Axia)**

95.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

96.   The ECPA provides a private right of action to "any person whose . . . electronic communications are intercepted, disclosed, or intentionally used in violation of" the Act. 18 U.S.C. § 2520(a). The Act prohibits both (a) intentionally intercepting, disclosing, or procuring another person to intercept any electronic communication, and (b) intentionally disclosing the contents of any electronic communication knowing that the information was obtained through unlawful interception. 18 U.S.C. § 2511(1)(a), (c).

97.   "Contents" includes "any information concerning the substance, purport, or meaning of [a] communication." *Id.* § 2510(8). Here, intercepted data includes patients' searches for specific medical specialties, conditions, and providers, which communicate the substance and meaning of patients' healthcare needs and therefore constitute "contents" within the meaning of 18 U.S.C. § 2510(8).

98.   The transmissions by Plaintiffs and other Class Members of their PII and PHI to axiawh.com were "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

99.   Axia violated ECPA in two independent and overlapping ways.

100.   First, Axia disclosed the contents of Plaintiff's and other Class Members' electronic communications to Trade Desk. Axia operates as a covered healthcare provider under HIPAA, and the information patients input on the "Find Care Near You" page—including zip code, selected medical specialty, and provider preferences—as well as the information patients enter when scheduling appointments—including full name, date of birth, phone number, email address, and type of appointment—is communicated directly by patients to Axia in the context of seeking care. TDP and its associated TDID cookie embed a persistent unique identifier in each visitor's browser and transmit it to Trade Desk through its servers at adsrvr.org, along with the user's IP address and page-level data. When these unique

22

identifiers travel in the same payload as the specialty preferences, conditions, and appointment information a patient enters on axiawh.com, the combined dataset constitutes IIHI and PHI, because the identifiers can be used by Trade Desk to single out the individual whose health data is implicated. Axia's transmission of that data to Trade Desk therefore constitutes both a "disclosure" under ECPA and a disclosure of PHI under HIPAA. *See* 45 C.F.R. §§ 160.103, 164.502(a), 164.514(b)(2).

101. Second, Axia procured Trade Desk to intercept those same communications. Axia made the affirmative decision to implement TDP on its website, deliberately copying Trade Desk's tracking code into axiawh.com's source code. Axia controls which pages contain the tracking code, could exclude it from sensitive pages where healthcare information is accessed, and could remove or modify it at any time, but has chosen not to do so. Axia continued deployment of TDP across the sensitive areas of its website represents an ongoing, deliberate choice to procure Trade Desk to intercept the electronic communications of its patients, in violation of 18 U.S.C. § 2511(1)(a).

102. The one-party consent exception of § 2511(2)(d) does not apply. Axia's disclosure of IIHI to Trade Desk violates HIPAA's criminal provision, which prohibits knowingly disclosing individually identifiable health information in violation of the Administrative Simplification provisions of HIPAA. 42 U.S.C. § 1320d-6(a)(3). Because Axia's consent to Trade Desk's interception was given for the purpose of committing this criminal act, the consent exception is unavailable.

103. Plaintiff and other Class Members did not consent to Axia's disclosure of, or Trade Desk's interception of, their private communications, nor could they have, as they were unaware these interceptions occurred concurrently with their use of axiawh.com.

104. Plaintiff and other Class Members suffered harm as a result of Axia's violations of the Act, and seek (a) preliminary, equitable, and declaratory relief as may be appropriate, (b) the greater of actual damages and Axia's profits from its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), (c) punitive damages, and (d) reasonable costs and attorneys' fees.

## THIRD CAUSE OF ACTION

**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act**

**18 Pa. C.S. §§ 5701, *et seq*. (WESCA)**

**(Against Axia)**

105.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

106.   WESCA, codified at 18 Pa. C.S. §§ 5701-5782, makes it unlawful for any person to intentionally: (1) intercept any wire, electronic, or oral communication; (2) disclose to any other person the contents of any such communication knowing or having reason to know the information was obtained through interception; or (3) use or endeavor to use the contents of any such communication knowing or having reason to know it was obtained through interception. 18 Pa. C.S. § 5703(1)-(3).

107.   WESCA provides a civil cause of action against any person who intercepts, discloses, uses, or procures any other person to intercept, disclose, or use a covered communication. 18 Pa. C.S. §§ 5725(a)(1)-(3).

108.   Axia is headquartered in Pennsylvania. On information and belief, all decisions to install, maintain, and retain the Trade Desk pixel and associated tracking cookies on axiawh.com were made by Axia from Pennsylvania, and all agreements with Trade Desk governing the deployment of that technology and the sharing of user data were entered into by Axia as a Pennsylvania corporation acting from Pennsylvania.

109.   When Plaintiff and other Class Members used axiawh.com, they transmitted electronic communications to Axia. Those communications included searches for care providers, selection of health services, scheduling of appointments, and submission of payment information. Each such interaction constituted an electronic communication containing "contents" within the meaning of WESCA, including information reflecting users' identities, health conditions, treatment needs, and financial information. *See* 18 Pa. C.S. § 5702.

110. By installing and maintaining TDP on axiawh.com, and pursuant to its commercial agreement with Trade Desk under which Axia exchanged access to users' communications and data for access to Trade Desk's advertising platform, Axia both disclosed the contents of Plaintiff's and other Class Members' electronic communications and procured Trade Desk to intercept and use those communications, and thereby subjected itself to liability under 18 Pa. C.S. § 5725(a) to the same extent as if it had performed the interception itself.

111. WESCA requires the prior consent of all parties before a communication may be intercepted by or disclosed to a third party. 18 Pa. C.S. § 5704(4). Axia obtained no such consent. Plaintiff and other Class Members were never informed that their communications would be simultaneously transmitted to Trade Desk.

112. As a direct and proximate result of Axia's violations of WESCA, Plaintiff and Class Members suffered harm, including the unauthorized disclosure of their electronic communications, the exposure of their PHI and PII to a third-party data broker, and the loss of their privacy interests in their medical communications.

113. Pursuant to 18 Pa. C.S. § 5725(a), Axia is liable for: (1) actual damages, but not less than liquidated damages of $100 per day for each day of violation, or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and litigation costs.

**FOURTH CAUSE OF ACTION**

**Intrusion Upon Seclusion**

**(Against Trade Desk)**

114. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

115. "Invasion of privacy has been recognized as a common law tort for over a century." *Matera v. Google Inc.*, 2016 WL 5339806, at *10 (N.D. Cal. Sept. 23, 2016) (citing Restatement (Second) of Torts §§ 652A-I for the proposition "that the right to privacy was first accepted by an American court in 1905, and 'a right to privacy is now recognized in the great majority of the American jurisdictions that have considered the question'"). "The

common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 198 (1890).

116.    The Restatement (Second) of Torts explains that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652B (1977).

117.    The Supreme Court has recognized the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to privacy older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

118.    The overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares their personal data. A recent study showed 92% of Americans feel companies should be required to prepare reports on what is done with user data, and 77% would likely support legislation that would prevent companies from selling personal data, with 75% of those who said they like personalized advertising also saying they would support such legislation.[11]

119.    Plaintiff and other Class Members have reasonable expectations of privacy in using axiawh.com and in their PHI, generally. The reasonable expectation of privacy in their PHI is intrinsic and further stems from and is reinforced by long-standing legal protections.

120.    Trade Desk violates axiawh.com users' right to privacy every time it eavesdrops and intercepts users' PHI, IIHI, and other private communications with axiawh.com, without their knowledge or consent.

121.    Trade Desk's intrusions, by viewing and utilizing Class Members' PHI for economic gain, are highly offensive to a reasonable person. This is self-evident from the

[11] *See* Aliza Vigderman, *Americans Get an F on Digital Privacy Knowledge*, Security.org (Apr. 1, 2025), *at* https://security.org/digital-security/american-digital-privacy-knowledge.

highly personal and protected nature of the health information that Trade Desk intrudes upon without consent.

122. Plaintiff and other Class Members were harmed by the intrusion of Trade Desk into their private affairs as detailed herein. Trade Desk's actions and conduct complained of were a substantial factor in causing the harm suffered by Plaintiff and other Class Members.

123. As a result, Plaintiff seeks injunctive relief prohibiting any further intrusions into Class Members' privacy by Trade Desk, the destruction of any information obtained as a result of its past intrusions, and damages in a sum to be determined at trial.

## FIFTH CAUSE OF ACTION

### Negligence

### (Against Axia)

124. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

125. Axia owed Plaintiffs and other Class Members a duty of care to protect their PHI and PII from unauthorized disclosure. This duty arises from at least two independent sources.

126. First, Axia's duty arises from the special relationship between a healthcare provider and its patients. The physician-patient relationship imposes a duty of confidentiality that is among the most fundamental obligations in medicine, recognized at common law, codified in HIPAA and its implementing regulations, and reflected in the ethical standards of the American Medical Association. This duty exists independently of any contract between the parties and requires Axia to take reasonable steps to prevent the unauthorized disclosure of patients' health information to third parties.

127. Second, Axia's duty arises from the foreseeable risk of harm. Axia knew or should have known that embedding third-party tracking technology on a healthcare website would result in the transmission of patients' sensitive health information to outside parties, and that such a disclosure could cause significant harm to patients, including invasion of their privacy, loss of control over their sensitive medical information, and the chilling of their willingness to seek healthcare.

27

128.    Axia breached these duties by embedding TDP on axiawh.com, thereby causing the automatic and invisible transmission of Plaintiffs' and other Class Members' PII and PHI to Trade Desk in real time, without patients' knowledge or consent, and for commercial advertising purposes directly contrary to its representations.

129.    Axia's breach reflects a reckless disregard for patients' privacy rights. Axia had complete control over its website and could have excluded TDP, and any other cookies and trackers, from sensitive pages or removed them entirely, but chose not to do so.

130.    As a direct and proximate result of Axia's negligence, Plaintiff and other Class Members have sustained actual damages, including the loss of the economic value of their personal health information, which was transmitted to and exploited by Trade Desk without their consent or compensation; and invasion of their privacy and the attendant emotional distress, anxiety, and loss of trust arising from the disclosure of their sensitive medical information to a commercial third party.

131.    The economic loss rule does not bar recovery where, as here, the defendant owes an independent duty arising from a special relationship and the plaintiff alleges non-economic harms including invasion of privacy and emotional distress.

132.    As a direct and proximate result of Axia's negligence, Plaintiff and other Class Members have sustained damages in a sum to be determined at trial, including compensatory damages for invasion of privacy, emotional distress, and loss of the value of their personal health information.

### SIXTH CAUSE OF ACTION

### Unjust Enrichment

### (Against All Defendants)

133.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

134.    Plaintiff and other Class Members conferred economic benefits on Defendants in the form of profits resulting from the use of the Class's PII and PHI to improve Defendants' products, services, and marketing efforts, including targeted advertising.

28

135. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to Plaintiff's and other Class Members' PII and PHI being obtained and used without their consent. Plaintiff and other Class Members have been injured because they have not been compensated for the benefits they conferred on Defendants and their legal remedies are inadequate to address this injury.

136. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of their wrongful conduct.

137. As a result, Plaintiff and other Class Members are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of their inequitable business practices.

## PRAYER FOR RELIEF

138. Wherefore, Plaintiff, individually and on behalf of the proposed Class, prays for judgment as follows:

    a. An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

    b. An Order requiring Defendants to bear the cost of Class Notice;

    c. An Order requiring Defendants to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

    d. An Order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful or unfair business act or practice;

    e. An Order requiring Defendants to pay statutory, compensatory, and punitive damages as permitted by law;

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT

f.    An Order enjoining Trade Desk from intercepting, learning the contents of, and profiting from private communications between Axia and users of axiawh.com without the users' consent;

g.    An Order enjoining Axia from allowing Trade Desk to intercept, learn the contents of, and profit from private communications between users and axiawh.com without the users' consent;

h.    An Order compelling Trade Desk's destruction of all data obtained from communications made by Class Members on axiawh.com without Class Members' consent;

i.    A judgment awarding any and all further equitable, injunctive, and declaratory relief as may be appropriate;

j.    Pre- and post-judgment interest, as permitted by law;

k.    An award of attorney fees and costs; and

l.    Such further relief as the Court deems necessary, just, or proper.

## JURY DEMAND

139.  Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 10, 2026                    /s/ Trevor Flynn

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
DANIEL E. SACHS
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

*Medvedevu v. The Trade Desk, Inc., et al.*
CLASS ACTION COMPLAINT